# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF KENTUCKY
# OWNENSBORO DIVISON

## CASE NO. 4:24-cv-18-DJH

[*FILED ELECTRONICALLY*]

**JOHN MICHAEL KEHOE**

Plaintiff,

v.

**KENTUCKY COMMUNITY AND TECHNICAL COLLEGE SYSTEM**

    **SERVE**:    Ryan Quarles, President
                       300 N. Main Street
                       Versailles, KY 40383

And

**MADISONVILLE COMMUNITY AND TECHNICAL COLLEGE**

    **SERVE:**    Dr. Cynthia Kelley, President
                       2000 College Drive
                       Madisonville, KY 42431

And

**RAY GILLASPIE**
Individually and in his official capacity as
Chief Business Officer, employee, and / or
agent of Madisonville Community College

      **SERVE**:    Ray Gillaspie
                           2000 College Drive
                           Madisonville, KY 42431

And

**TODD SMITH**
Individually and in his official capacity as
Program Director of Aviation, employee, and / or
agent of Madisonville Community College

      **SERVE**:    Todd Smith
                           2000 College Drive
                           Madisonville, KY 42431

And

**RYAN HOBBY**

      **SERVE:**    Ryan Hobby
                           1000 Ivydale Drive
                           Evansville, IN 47725

Defendants.

**********

**COMPLAINT**

Comes the Plaintiff, John Michael Kehoe, by and through counsel, and for his Complaint against Defendants, Kentucky Community and Technical College, Madisonville Community College, Ray Gillaspie, Todd Smith, and Ryan Hobby states as follows:

**PARTIES AND JURISDICTION**

1. The Plaintiff, John Michael Kehoe ("Mr. Kehoe"), is a citizen of the United States and a resident of this judicial district.

2. The Defendant Kentucky Community and Technical College System operates Madisonville Community College ("MCC") as part of Kentucky's state university system organized under Chapter 164 of the Kentucky Revised Statutes.

3. Defendant Ray Gillaspie, on information and belief, was, at all times relevant herein, Chief Business Officer and / or otherwise an employee and agent of MCC and held decision making authority with regard to employment of MCC staff, including the Plaintiff.

4. Defendant Todd Smith, on information and belief, was, at all times relevant herein, Program Director of Aviation and / or otherwise an employee and agent of MCC.

5. Defendant Ryan Hobby was, at all times relevant herein, a resident of the state of Indiana, and the events giving rise to the action against him occurred within the Commonwealth of Kentucky.

6. This Court may exercise personal jurisdiction over these Defendants because the Defendants' actions herein all occurred within the Commonwealth, the Defendant MCC is organized under the laws of Kentucky, regularly conducts business in Kentucky, and the events giving rise to this action occurred exclusively within the Commonwealth of Kentucky.

7. This Court has subject matter jurisdiction over this action because the Plaintiff asserts a claim under §1983 in his Fourth Cause of Action, below. This vests the Court with federal question jurisdiction under 28 U.S.C. §1331.

8. This Court possesses supplemental jurisdiction under 28 U.S.C. §1367 over the Plaintiff's remaining claims because those claims are so related to Mr. Kehoe's §1983 claim herein that these remaining claims form part of the same case or controversy.

9. The events giving rise to Mr. Kehoe's claims occurred within this judicial district and division.

Therefore, venue is proper under 28 U.S.C. §1391.

## FACTS

10. Mr. Kehoe is a pilot, born in August of 1943. He is a four-time NAFI Master Instructor, an FAA Gold Seal Instructor and was the LVFSDO Instructor of the year in 2016.

11. On July 1, 2020, Mr. Kehoe was hired to be the sole Director of Aviation at Madisonville Community College. He was paid a salary of $100,000.00 per year.

12. Mr. Kehoe's job consisted of supervising certified flight instructors as well as providing oversight of all employees assigned to support MCC's newly created aviation program (the "Program.")

13. Mr. Kehoe was also tasked with ensuring the Program was operating in compliance with applicable regulations. One example of this is when he was put in charge of preparing for and successfully passing a Veteran's Administration inspection of the Program not long after his hire. Mr. Kehoe spent all day going back and forth from MCC's campus, the Muhlenberg Airport Facility, and the Madisonville Airport to meet with representatives and inspectors from the VA.

14. At the end of the day, Mr. Kehoe was called to the office of MCC's president, Dr. Cynthia Kelley, where she and MCC's Chief Business Officer Ray Gillaspie were waiting. There, they falsely accused Mr. Kehoe of conducting an interview with a local reporter about the Program's VA status.

15. In reality, a reporter present at the Airport Board of Directors' monthly meeting two days prior had quoted something unrelated Mr. Kehoe said in the local paper, and unbeknownst to Mr. Kehoe.

16. After correcting Ms. Kelley and Mr. Gillaspie's understanding about his conversations with the press, Ms. Kelley and Mr. Gillaspie told Mr. Kehoe never to make any public comments about the Program's VA status.

17. In early June 2021, Mr. Gillaspie informed Mr. Kehoe that he was being replaced as the Program Director by an individual named Todd Smith. Todd Smith is much younger than Mr. Kehoe and has far less experience as both a pilot and an instructor.

18. Mr. Gillaspie went on to offer Mr. Kehoe the alternative position of "Chief Flight Instructor." The Chief Flight Instructor position was accompanied by a pay reduction of $20,000.00 per year. However, Mr. Gillaspie assured Mr. Kehoe he would remain heavily involved in the oversight and management of the Program, retaining all the same job duties and responsibilities Mr. Kehoe held as Director.

19. Mr. Kehoe took several days to think about Mr. Gillaspie's offer. While he was disappointed in the pay reduction, and skeptical about the qualifications of his much younger replacement, he was deeply invested in the success of the Program and therefore decided to accept Mr. Gillaspie's offer.

20. Mr. Kehoe assumed the role of Chief Flight Instructor effective July 1, 2021.

21. Almost immediately thereafter, MCC began actively working to oust Mr. Kehoe from the Program entirely.

22. Prior to July 2021, Mr. Kehoe had a good working relationship with a third-party pilot examiner named Ryan Hobby. Mr. Kehoe and Mr. Hobby had always communicated well together and would often discuss the progress of the Program. But abruptly after Mr. Kehoe

was replaced as Director by Todd Smith, Mr. Hobby became aloof toward Mr. Kehoe and became overly critical of Mr. Kehoe's students.

23. Mr. Kehoe would later learn that his coworkers at MCC were making derogatory comments about him to his students (and likely to Mr. Hobby, as well), referring to him as "the elderly man in left lane doing 60 mph with his blinker still on."

24. In January 2022 Mr. Kehoe discovered that a new flight instructor by the name of Colin Gorton had been hired by MCC.

25. It is customary in any aviation program for the Chief Flight Instructor to oversee the hiring of other flight instructors. At a minimum, the Chief Flight Instructor is ordinarily asked to weigh in on the decision after reviewing a candidate's application, credentials, and participating in a fly-along.

26. Yet MCC did not even inform Mr. Kehoe that Mr. Gorton had been hired, much less asked his opinion on the matter. If it had, Mr. Kehoe would have expressed his trepidations about Mr. Gorton, as Mr. Gorton possessed very few instructional hours and lacked many of the credentials required to teach courses for the Program.

27. Once Mr. Kehoe finally became aware that Mr. Gorton had been hired, Mr. Kehoe arranged to fly with him. During the flight, Mr. Kehoe's concerns about Mr. Gorton only worsened. Mr. Kehoe reported these concerns to Todd Smith and requested that Mr. Kehoe be given the chance to fly with Mr. Gorton a few more times before allowing students to fly with him.

28. Todd Smith ignored Mr. Kehoe's request. Students of MCC's aviation Program were immediately assigned to fly with Mr. Gorton despite Mr. Kehoe's express concerns.

29. To make matters worse, Mr. Kehoe would later learn that Mr. Gorton had been assigned to teach the Program's Instrument Ground Course despite not having the necessary qualifications to do so.

30. Mr. Kehoe immediately alerted MCC to this dangerous, and illegal, problem. Shockingly, MCC's solution was simply replace Mr. Gorton's name on the course with Mr. Kehoe's, who did possess the required qualifications, but allow Mr. Gorton to continue teaching the Course, anyway. Mr. Kehoe told Todd Smith that he would report it to the FAA if the practice continued.

31. MCC's treatment of Mr. Kehoe worsened after he raised these concerns. For example, On or around February 18, 2023, Mr. Kehoe overheard talk that an MCC airplane and helicopter was to be taken to some kind of event. Mr. Kehoe, curious, asked Todd Smith about it. Todd Smith dismissed Mr. Kehoe's interest, brushing it off as "nothing important."

32. A few days later, Mr. Kehoe was included in a group text among MCC's Program employees wherein Todd Smith thanked multiple members of the Program, including new-hire Mr. Gorton, for attending the event, which apparently had successfully brought in a large amount of funding for the Program.

33. It was evident to Mr. Kehoe that he was the only person told not to attend the event, despite being Chief Flight Instructor of the Program, a position that would be expected to represent the Program at such an event.

34. In March, Mr. Kehoe happened to learn that MCC had hired yet another flight instructor without his knowledge or input, a man named Charles Lily.

35. By now, Mr. Kehoe had been excluded from participating in important meetings, events, instructional assignments, and making decisions, including the hiring of instructors, instructor training, and student assignments.

36. The writing on the wall was now exceptionally clear to Mr. Kehoe: He was not welcome in the Program.

37. Recognizing he had been constructively discharged, Mr. Kehoe tendered his reluctant resignation from the Program on March 14, 2022. He later relocated to Colorado.

38. In October of 2022, Mr. Kehoe began corresponding with the FAA about an open Aviation Safety Inspector position, based in Kentucky. As a Safety Inspector, Mr. Kehoe would have been tasked with supervising other local Pilot Examiners (like Ryan Hobby) as well as investigate and oversee collegiate aviation programs (such as MCC.)

39. The FAA tentatively offered Mr. Kehoe the positions on March 14, 2023, no doubt due to his impressive resume and accolades as a pilot and instructor. The position paid $93,875 per year with a $10,000 relocation bonus.

40. Mr. Kehoe readily accepted the FAA's offer. To be a Safety Inspector for the FAA was Mr. Kehoe's dream job. He immediately began making arrangements to relocate back to Kentucky.

41. But on April 4, 2023, less than a week before he was scheduled to board a plane back to Kentucky, the FAA rescinded its employment offer.

42. The reason, according to the FAA's hiring coordinator Donna Heinlein, was that Ryan Hobby and Todd Smith had reached out to the FAA with allegations that Mr. Kehoe was unsafe to teach or fly.

43. Mr. Kehoe was devastated. But having already made arrangements to relocate to Kentucky, he had little choice but to move across the country once again and start over in Sacramento, Kentucky. In June 2023 he began instructing independently at the nearby Madisonville Regional Airport where MCC also held flight operations.

44. To generate business, Mr. Kehoe placed his business cards around the airport advertising his flight instruction services. On three separate occasions, he arrived at the airport to discover his business cards nowhere to be found.

45. On August 8, 2023, Mr. Kehoe received a text message from MCC flight instructor Charles Lily requesting that Mr. Kehoe call him. Mr. Kehoe found this strange as he had never spoken to Charles Lily before this day.

46. When Mr. Kehoe called Charles Lily as requested, Mr. Lily admitted to throwing out Mr. Kehoe's business cards, his reason being that Mr. Kehoe apparently "[doesn't] need to be flight instructing." Mr. Lily went on to compare Mr. Kehoe's flying abilities to being "like when your dad gets too old to drive" and stated that "technology was the kryptonite to the elderly."

47. Later the same day, Charles Lily called Mr. Kehoe a second time. This time, Mr. Lily apologized, explaining that he had been influenced by "people [he] works with on a daily basis."

### COUNT I: AGE DISCRIMINATION IN VIOLATION OF THE KENTUCKY CIVIL RIGHTS ACT, KRS §344.040 *et seq.,* AGAINST MCC

48. Mr. Kehoe incorporates Paragraphs 1-47 as if fully set out herein.

49. KRS §344.040 makes it unlawful to "discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's…age forty (40) and over[.]"

50. Mr. Kehoe was always and is over the age of forty during the period relevant to this Complaint.

51. MCC engaged in the unlawful act of discrimination against Mr. Kehoe when it took adverse employment actions against him by way of removing him from his position as Director of the Program, replacing him with a substantially younger person, demoting him to the lesser paid position of Chief Flight Instructor, stripping him of his responsibilities as Chief Flight Instructor, and creating humiliating and intolerable working conditions sufficient to cause the constructive discharge of his employment.

52. Mr. Kehoe's age was a motivating factor in deciding and did make a difference in the decision to take the above-described adverse employment actions, and others, against him.

### COUNT II: WHISTLEBLOWER RETALIATION IN VIOLATION OF THE KENTUCKY WHISTLEBLOWER ACT, KRS §61.102, AGAINST MCC

53. Mr. Kehoe incorporates Paragraphs 1-52 as if fully set out herein.

54. KRS §61.102 prohibits MCC from retaliating against its public employees who report or are about to report any facts or information relative to an actual or suspected violation of any law or rule or substantial and specific danger to public health or safety.

55. Mr. Kehoe engaged in such protected activity when he warned MCC that he intended to report MCC's ongoing and dangerous FAA violations to the FAA.

56. MCC unlawfully retaliated against Mr. Kehoe by way of stripping him of his responsibilities as Chief Flight Instructor and creating humiliating and intolerable working conditions sufficient to cause the constructive discharge of his employment.

### COUNT III: WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY AGAINST MCC

57. Mr. Kehoe incorporates Paragraphs 1-56 as if fully set out herein.

58. Mr. Kehoe was discharged from his employment with MCC contrary to a fundamental and well-defined public policy.

59. Mr. Kehoe made observable efforts to bring MCC's aviation Program into compliance with mandatory regulations established by the FAA.

60. MCC retaliated against Mr. Kehoe for engaging in these efforts when it and creating humiliating and intolerable working conditions sufficient to cause the constructive discharge of his employment.

61. MCC's actions in constructively discharging Mr. Kehoe constitute the common law claim of discharge in violation of public policy.

### COUNT IV: RETALIATION FOR EXERCISE OF PROTECTED FIRST AMENDMENT ACTIVITY AGAINST MCC, GILLASPIE, AND SMITH

62. Mr. Kehoe incorporates Paragraphs 1-61 as if fully set out herein.

63. 42 U.S.C. §1983 ensures that citizens are not retaliated against by their government for engaging in protected First Amendment Activity.

64. Mr. Kehoe engaged in protected activity when he spoke out about matters of public concern affecting MCC and its students, including but not limited to MCC's ongoing violations of mandatory FAA regulations.

65. MCC, Gillaspie, and Smith knew Mr. Kehoe engaged in the protected activity.

66. Mr. Kehoe was retaliated against when MCC, Gillaspie, and Smith created humiliating and intolerable working conditions sufficient to cause the constructive discharge of his employment.

67. MCC, Gillaspie, and Smith acted with callous disregard to Mr. Kehoe's First Amendment rights.

68. These retaliatory actions have harmed Mr. Kehoe. In addition to the financial harm and harm to his reputation, Mr. Kehoe has suffered emotional distress as a result of the actions of MCC, Gillapsie, and Smith.

### COUNT V: TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP AND PROSPECTIVE BUSINESS RELATIONSHIP AGAINST ALL DEFENDANTS

69. Mr. Kehoe incorporates Paragraphs 1-68 as if fully set out herein.

70. As described above, Mr. Kehoe accepted an offer of employment from the FAA in the position of Safety Inspector and had a valid expectancy of employment pursuant to that agreement.

71. The Defendants, each of them, were aware of the relationship between Mr. Kehoe and the FAA and of Mr. Kehoe's expectancy of employment.

72. The Defendants, each of them, individually and, in Gillaspie and Smith's case, in their official capacities as employees and agents of MCC, intentionally interfered with this relationship and expectancy by disparaging and making baseless, false, and defamatory statements about Mr. Kehoe for the purpose of causing the FAA to rescind or withdraw any offer of employment to the Plaintiff that might result in Mr. Kehoe having any authority over MCC or its employees. The statements were made maliciously, wantonly, recklessly and with gross negligence for the very purpose of interfering with the Plaintiff's business contract and business expectation.

73. The motive for this interference was improper and based on, inter alia, personal bias against Mr. Kehoe because of his age and because of personal animosity arising from his previous efforts to report unsafe activities by the Program.

74. The statements made by the Defendants, each of them, individually and, in Gillaspie, Smith's case, in their official capacities as employees and agents of MCC, were a substantial cause of the FAA withdrawing the offer of employment to Mr. Kehoe.

75. As a result of this intentional and malicious conduct, the Plaintiff was damaged, through the loss of the prospective business advantages, including salary and benefits, and in preparations he made for relocating for the purposes of performing his new duties with the FAA.

### COUNT VI: DEFAMATION AGAINST ALL DEFENDANTS

76. Mr. Kehoe incorporates Paragraphs 1-75 as if fully set out herein.

77. The Defendants, as described herein, each of them, individually and, in Gillaspie, Smith's case, in their official capacities as employees and agents of MCC, made statements to third parties, including employees of the FAA and to others, of a false and defamatory nature which disparaged the Plaintiff and falsely indicated that he was not competent or qualified as an aviation instructor or in aviation safety.

78. Defendants knew, or should have known, that these statements were false.

79. Defendants made these statements, with knowledge of their falsity or with reckless disregard for the truth, with malice and intent that Mr. Kehoe's reputation would be damaged thereby.

80. As a direct and proximate result of these defamatory statements, the Plaintiff suffered harm through the damage to his reputation and through the loss of business opportunities.

### COUNT VII: PUNITIVE DAMAGES AND ATTORNEYS FEES

81. Mr. Kehoe incorporates Paragraphs 1-80 as if fully set out herein.

82. The actions taken by the Defendants as described herein were willful, wanton, intentional, malicious and grossly negligent sufficient to warrant the imposition of punitive damages.

83. Plaintiff is entitled to reasonable attorney fees under 42 U.S.C. §1988 and KRS §344.450.

## PRAYER FOR RELIEF

84. Mr. Kehoe incorporates Paragraphs 1-83 as if fully set out herein.

85. **WHEREFORE**, Plaintiff, John Michael Kehoe, prays that this Court:

   a. Declare Defendants' conduct in violation of Mr. Kehoe's rights;

   b. Award Mr. Kehoe compensatory damages in such amounts as shall be proven at trial for his economic and other losses, including, but not limited to, lost back and front pay wages and benefits;

   c. Award Mr. Kehoe damages against Defendants in an amount to be proven at trial for the embarrassment and humiliation, personal indignity, apprehension about his past, current and future economic well-being, emotional distress and anguish, which have been inflicted upon Mr. Kehoe by Defendants' wrongful acts;

   d. Award Mr. Kehoe punitive damages;

   e. Award Mr. Kehoe all attorney fees, costs, and expenses incurred in pursuing this matter;

   f. Award Mr. Kehoe post-judgment interest;

   g. Grant Mr. Kehoe such further relief as this Court may deem just and proper.

## JURY DEMAND

51. Plaintiff, John Michael Kehoe demands a jury to try all issues triable by jury.

Respectfully Submitted,


*/s/*Jeffrey L. Freeman
Jeffrey L. Freeman (Ky. Bar No. 82886)
Freeman Legal Group PLLC
4949 Brownsboro Rd., Ste. #278
Louisville, KY 40222
*jfreeman@loulegal.com*

And

Lauren Freeman (Ky. Bar No. 98492)
Freeman Law PLLC
4010 DuPont Circle, Ste. #309
Louisville, KY 40207
*lfreeman@loulegal.com*

COUNSEL FOR PLAINTIFF